# Jakeway et al. *v.* Lehigh Valley R. R. Co., Appellant.

*Railroads—Carriers—Live stock—Negligence—Connecting carrier—Embargo—Bill of lading—Limitation of liability—Measure of damages.*

1. Where live stock was delivered to a carrier billed to a point beyond its own line, but the connecting carrier did not receive it because of an embargo, and it appears that the initial carrier was guilty of negligence in unloading and hauling the stock, so that it was injured, such carrier is liable to the shipper for the loss sustained.

2. In a suit against such initial carrier alone, where the jury returned a general verdict for plaintiff, but divided the amount thereof between the initial and connecting carrier, although the stock

had not even been tendered to the latter, and no assignment of error covered the verdict and no question was raised as to its form in the court below, the appellate court will treat that part of the verdict, additional to the general verdict, as surplusage.

3. A statement in a bill of lading that the amount of any loss or damage shall be computed at the value of the property at the place and time of shipment, is invalid, where the loss or damage has been occasioned by the negligence of the carrier.

Argued March 12, 1923. Appeal, No. 100, Jan. T., 1923, by defendant, from judgment of C. P. Bradford Co., Sept. T., 1920. No. 89, on verdict for plaintiff, in case of Jakeway & Tyrrell v. Lehigh Valley Railroad Co. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART and SCHAFFER, JJ. Affirmed.

Assumpsit for injury to live stock. Before MAXWELL, P. J.

The opinion of the Supreme Court states the facts.

Verdict and judgment for plaintiff for $1,740.18, one-half to be paid by the defendant, and the other by the Pennsylvania Railroad Co. Defendant appealed.

*Errors assigned*, inter alia, were refusal of judgment for defendant n. o. v., and ruling on evidence, quoting record.

*William P. Wilson*, with him *J. Roy Lilley*, for appellants.—The Public Service Law does not impose liability on initial carrier for damages to live stock caused by delay, resulting from the refusal to receive and transport the shipment by a connecting carrier: Com. v. Gouger, 21 Pa. Superior Ct. 217.

By adopting in the Public Service Law the language of the Carmack Amendment to the Hepburn Act the legislature intended to make the law of this Commonwealth as to intrastate shipments uniform with the law of the United States as to interstate shipments and our courts will follow the construction of this language as then held

by the federal courts: Willis v. Trust & Banking Co., 169 U. S. 295.

On an intrastate shipment of cattle in this Commonwealth where damages occur from delay occasioned by an embargo of a connecting carrier, justified because of mob violence, the burden is on plaintiff to prove that the delay resulted from negligence, and, in the absence of such proof, a provision in the bill of lading that the damages shall be computed upon the value at the time and place of shipment is valid and enforceable: Buck v. R. R., 150 Pa. 170.

*Chas. M. Culver,* for appellees.—When a carrier accepts a shipment without notifying the shipper of circumstances likely to occasion delay in transit, or fails to obtain his assent to such delay, it is bound to transport the goods within a reasonable time, notwithstanding an emergency that may arise: Joynes v. R. R., 235 Pa. 232, 237; Dawson v. R. R., 79 Mo. 296; Mussey v. Ry., 4 McCrary (U. S.) 405; Alexander v. R. R., 7 Pa. Superior Ct. 183.

Our public policy has not been changed by the Public Service Law, nor could the public service or any other law change the public policy of this State because public policy is above the law, and a law which conflicts therewith, is a nullity: Willock v. R. R., 166 Pa. 184; Eckert v. R. R., 211 Pa. 267; Hughes v. R. R., 202 Pa. 222.

A company cannot limit its liability as against its own negligence: Am. Exp. Co. v. Sands, 55 Pa. 140; Grogan v. Exp. Co., 114 Pa. 523; Hughes v. R. R., 202 Pa. 222; Eckert v. R. R., 211 Pa. 267; P. R. R. v. Raiordan, 119 Pa. 577; Buck v. R. R., 150 Pa. 170; Willock v. R. R., 166 Pa. 184.

OPINION BY MR. JUSTICE SCHAFFER, April 16, 1923:

The action is assumpsit on a contract for the carriage of live stock, the right of recovery being based on defendant's failure to transport and deliver as it had under-

taken to do, and upon its negligent handling of the shipment.

While appellant (defendant) presents to us the questions whether an initial carrier, under the Public Service Company Act, is liable for damages, caused by delay, resulting from the refusal of a connecting carrier to receive a shipment, and whether, under the facts as it views them, the damages should be computed on the value at the place of shipment or at destination, our study of the record leads us to the conclusion that the first question cannot arise under the evidence, giving plaintiffs, as we must, the benefit of all facts proven in their favor (Williams v. F. & W. Grand Five, Ten & Twenty-five Cent Stores, Inc., 273 Pa. 131; Mitchell v. City of New Castle, 275 Pa. 426), and the second, under the testimony, which showed defendant's negligence, has been authoritatively settled against it.

The shipment of live stock in question consisted of two carloads of calves and hogs, loaded at various stations along the line of defendant's road in Bradford County, this State. It was a through shipment, plaintiffs having paid the freight to destination, and was routed over the lines of defendant and the Pennsylvania Railroad Company. The stock was transported under uniform live stock contracts, calling for delivery at the West Philadelphia stockyards of the latter carrier. The usual time consumed in transportation, from the point of origin to the point of destination, was from 24 to 28 hours.

On the night of the delivery of the live stock to defendant, the Pennsylvania Railroad Company declared an embargo, because of a strike, against shipments of live stock reaching its line at the point of interchange between it and defendant; notice of this embargo was received by the latter the next morning. On its receipt, appellant endeavored to communicate with plaintiffs, finally succeeded in doing so, and obtained permission from them to change the route of the shipment to the Philadelphia & Reading Railroad Company; but, before

delivery could be made to that company, it also had declared an embargo. Plaintiffs were then notified that defendant was unable to deliver the stock in Philadelphia and were requested to take charge of it. It was then at Lehighton on the line of defendant's road; it refused to move the shipment any farther.

When the stock was loaded in the cars, the calves and hogs were separated by a partition. On arrival of one of the plaintiffs at Lehighton on Tuesday morning (the stock had been loaded on Saturday afternoon), he found it had been in the railroad yards at that place since the preceding Sunday, that the animals had been unloaded and reloaded, that one of the partitions separating the calves from the hogs had been removed, and that a large number of them had been loaded together, that one car contained many more animals than when shipped, that they had received little or no attention, and were greatly overcrowded, many of them being down, trampled upon and nearly dead, that in one end of the car the calves and hogs were piled on each other, one calf was dead and a number had to be lifted up and carried out of the cars as they were nearly so; as a result of the carelessness in their reloading and inattention to them, they had all been greatly damaged and depreciated in value.

It was sometime after the arrival of the plaintiff who went to Lehighton, before he could prevail upon defendant to deliver the stock at a point where it could be unloaded; this was done only after he threatened legal proceedings for the cruel manner in which the animals had been and were being treated. The company finally moved the cars to a siding where they were unloaded. It became necessary to butcher the stock in Lehighton; part were sold there and the rest in New York, whence they were shipped by truck, it being the nearest available market.

Appellant admits there was evidence from which a jury might infer negligence on its part which caused part of the damage. As we read the testimony, all of the damage could have resulted from its negligent loading and hand-

ling of the stock, irrespective of the delay in shipment; this fixes defendant with full liability. Very pertinent to the instant case is the language of the Superior Court in Alexander v. Penna. R. R. Co., 7 Pa. Superior Ct. 183, 186, "Whether the plaintiff's cattle were forwarded with reasonable dispatch, and, if not so forwarded, whether injury arose from default in transportation, or in the mode of keeping them while in the defendant's care, were questions for determination by a jury."

The fourth assignment of error covers the refusal of the court to admit evidence, offered by defendant, to show the market price of the stock at the point of shipment, the contention being that, as the bill of lading provides "The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the live stock at the place and time of shipment under this contract," this measures defendant's responsibility to pay. However the rule might be if there were no negligence shown, where the carrier's negligence appears, this limitation on liability in the bill of lading is unavailing. "A statement in a bill of lading that the amount of any loss or damage shall be computed at the value of the property, at the place and time of shipment, is invalid where the loss or damage has been occasioned by the negligence of the carrier": Ruppel v. Allegheny Valley Ry. Co., 167 Pa. 166; Hughes v. Penna. R. R. Co., 202 Pa. 222.

One further matter requires comment. In addition to the general verdict for plaintiffs for $1,740.18, the jury made a special finding, "of which amount $870.09 is the damages which should be paid by the Lehigh Valley Railroad Company and $870.09 is the damages which should be paid by the Pennsylvania Railroad Company." This was in response to the court's direction that they should so find. It is difficult to understand why, under the circumstances of this case, the jury should have been thus instructed. The shipment in question had not even been tendered to the Pennsylvania Railroad Company,

much less been received by it. Defendant had obtained authority from plaintiffs to reroute it over the Philadelphia and Reading Railroad, but that company also declared an embargo. Just why, of the two connecting carriers who might have received the shipment, neither of whom was a party to the record, one should be singled out to pay part of the verdict, is incomprehensible. It is true, this finding was made at the suggestion of counsel for defendant, and was evidently for the purpose of measuring in some way a possible claim as between the defendant, as the initial carrier, and the designated subsequent carrier. We doubt the wisdom of endeavoring in this way to work out the equities between connecting carriers, as to responsibility for damages caused to shippers. The colloquy between court and jury shows that the latter did not understand what they were called upon to determine; after returning to the court room to find out what the judge meant by his instruction in this respect, and not having been enlightened, they evidently did the best they knew how by splitting in half the amount of the verdict between the two companies. While there was no warrant for rendering such a special finding, under the facts disclosed, which established the negligence of the defendant, no assignment of error covers the verdict and the court below in its opinion says no question was raised as to its form. That part of it, additional to the general verdict, may therefore be considered as surplusage.

The assignments of error are all overruled and the judgment is affirmed.